Argued and submitted April 26; permanency judgment and guardianship judgment reversed and remanded, otherwise affirmed July 6, 2017

In the Matter of K. S.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Appellant,*
*and*

K. S.,
*Appellant,*

*v.*

A. B.,
*Respondent.*

Washington County Circuit Court
J100444;
Petition Number 01J100444;
A163190

401 P3d 279

Inge D. Wells, Assistant Attorney General, argued the cause for appellant Department of Human Services. With her on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Kim E. Hoyt argued the cause for respondent. With her on the brief was Garrett Hemann Robertson P.C.

Ginger Fitch filed the brief for appellant child.

Before DeVore, Presiding Judge, and Garrett, Judge, and Duncan, Judge pro tempore.

## GARRETT, J.

In this dependency case involving child K, the juvenile court *sua sponte* set aside its earlier judgment terminating mother's parental rights, then entered judgments changing K's permanency plan away from adoption and appointing K's maternal grandfather, who resides in California, as K's guardian under ORS 419B.366. At the time of the juvenile court's actions, California had declined to approve the placement under the Interstate Compact on the Placement of Children (ICPC), ORS 417.200 to 417.260. The Department of Human Services (DHS) and K appeal, arguing principally that (1) the juvenile court had no authority to *sua sponte* set aside the termination judgment, and (2) the court violated the ICPC by changing K's permanency plan to a durable guardianship and appointing grandfather as guardian. We decline to address the first issue because the claim of error was not preserved below. With respect to the second issue, we agree that the juvenile court's permanency and guardianship judgments violate the ICPC to the extent that they "cause[]" K to be placed in California without that state's approval.[1] Accordingly, the permanency and guardianship judgments are reversed and remanded; the judgment setting aside the termination judgment is affirmed.[2]

We review whether the juvenile court acted within its statutory authority, including the construction of relevant statutes, for legal error. *Dept. of Human Services v. S. E. K. H./J. K. H.*, 283 Or App 703, 706, 389 P3d 1181 (2017).

K was born in 2007 and became a ward of the juvenile court in 2010; in 2012, her permanency plan was changed to adoption. Both parents' parental rights were

---

[1] *See* ORS 417.200, Art III(d) ("The child shall not be sent, brought, or *caused* to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." (Emphasis added.)).

[2] DHS also appeals from an order entered by the trial court on September 29, 2016. That order is not the subject of any assignment of error, and we do not address it.

terminated in 2013. The department has attempted since then to find an adoptive home for K.

Beginning in 2012, grandfather expressed an interest in being a placement resource for K. DHS made a referral under the ICPC to California officials to determine whether K could be placed with grandfather. *See* OAR 413-040-0265 (outlining steps for arranging an interstate placement under the ICPC). In March 2015, California officials denied the request to conduct an adoption home study based on concerns about grandfather's criminal history. Grandfather appealed that ruling in California, unsuccessfully.

Notwithstanding California's denial, on May 24, 2016, the juvenile court informed the parties at a hearing that it was considering placing K in a guardianship with grandfather. DHS responded in a memorandum that such an action would violate the ICPC because grandfather had not been approved as a placement by California officials.

The court then ordered briefing on the issue of "whether the Court can dismiss DHS and establish an out of state guardianship with Grandfather." DHS and K's court-appointed special advocate (CASA) filed briefs arguing that the court lacked authority to place K in California without that state's approval under the ICPC. The CASA added that "the court's only power in this situation is to dismiss jurisdiction completely and allow a parent with the legal authority to do so to make an out of state placement."

On September 7, 2016, grandfather filed a motion for durable guardianship of K under ORS 419B.366. That same day, the juvenile court held a permanency hearing. Grandfather argued that the juvenile court could avoid the need to comply with the ICPC if it set aside the judgment terminating mother's parental rights and then appointed grandfather as K's guardian. Both DHS and the CASA expressed reservations about the timing of the guardianship request, and the CASA expressed concern about the prospect of setting aside the termination judgment. Neither argued, however, that the juvenile court lacked the legal authority to set aside that judgment.

The permanency hearing resumed on September 23, 2016. DHS argued that the court "lack[ed] the authority to do a durable guardianship" because it "would violate the ICPC." Grandfather reiterated his argument that the court could avoid the requirements of the ICPC by establishing a durable or permanent guardianship.

The juvenile court ruled from the bench. The court first ordered that the judgment terminating mother's parental rights be set aside, citing ORS 419B.923.[3] The court stated that mother would be "directed to sign a power of attorney" to grandfather. The court changed K's permanency plan to a durable guardianship under ORS 419B.366, granted grandfather's motion for guardianship, and dismissed DHS's legal custody of K.[4] The court also stated that it would "oversee" the guardianship "for at least six months."[5]

On appeal, DHS and K first argue that the juvenile court abused its discretion in setting aside the 2013 judgment terminating mother's parental rights because the court lacked authority to do so under ORS 419B.923. DHS acknowledges that it did not make that argument below but argues that preservation is excused because DHS had no "practical ability" to raise the issue. In addition, DHS argues that raising an objection below would have been "futile" because the juvenile court had made it clear that it intended to place K with grandfather regardless of any argument as to the court's authority under ORS 419B.923.

---

[3] ORS 419B.923(1) provides that, "[e]xcept as otherwise provided in this section, on motion and such notice and hearing as the court may direct, the court may modify or set aside any order or judgment made by it." ORS 419B.923(8) provides: "This section does not limit the inherent power of a court to modify an order or judgment within a reasonable time or the power of a court to set aside an order or judgment for fraud upon the court."

[4] The court cited ORS 419B.337(7) as providing the authority for such dismissal. We express no view as to whether ORS 419B.337(7) authorized the juvenile court to dismiss K's commitment to DHS's custody.

[5] Grandfather does not dispute that K remains a ward of the juvenile court despite its order dismissing K's commitment to DHS. *See* ORS 419B.328(2) (providing that the juvenile court's wardship continues until, among other things, the court dismisses the dependency petition, the court enters an order terminating the wardship, or a judgment of adoption is entered).

We respectfully disagree with DHS. The record reflects that the juvenile court discussed the guardianship issue with the parties for several months, and that, by no later than September 7, 2016, DHS was aware that grandfather had proposed a roadmap for avoiding the ICPC that would involve setting aside the termination judgment and establishing a guardianship. Although the CASA pointed out that doing so would present a "significant issue," neither DHS nor K argued that the juvenile court lacked the *authority* to set aside the termination judgment. Rather, their arguments focused on the timing of a guardianship and compliance with the ICPC. Those issues are distinct from the argument being made on appeal, which is that the juvenile court lacked statutory authority to *sua sponte* set aside the termination judgment.

Moreover, the record provides no basis for us to conclude that it would have been "futile" for DHS to take advantage of its opportunities to make that argument below. It is certainly clear that the juvenile court was frustrated with DHS's handling of the case and the amount of time that had passed without finding an adoptive home for K. It is also clear that the court was interested in exploring a guardianship with grandfather. Yet, the juvenile court repeatedly asked the parties for input on that matter, both orally and in writing. In other words, it appears that the juvenile court wanted to find a *lawful* means for placing K with grandfather; we see no reason to infer that the court would have ignored DHS's argument that the court lacked authority to set aside the judgment under ORS 419B.923, if that argument had been timely made. For the foregoing reasons, we conclude that DHS's and K's challenge to the juvenile court's order setting aside the termination judgment is unpreserved, and we decline to consider it further.

The second issue on appeal is whether the juvenile court erred in changing K's permanency plan to a durable guardianship and appointing grandfather as guardian notwithstanding California's refusal to accept that placement under the ICPC. Grandfather concedes that, if the ICPC applies, its requirements were not met. Grandfather argues that the ICPC does not apply to this case. For the reasons

explained below, we conclude that the ICPC does apply, and, therefore, the juvenile court erred.

The ICPC provides, in relevant part:

> "No sending agency[6] shall send, bring, or cause to be sent or brought into any other party state any child for placement in *foster care* or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein."

ORS 417.200, Art III(a) (emphasis added). Grandfather argues that the durable guardianship ordered by the juvenile court is not "foster care" within the meaning of that provision, and is, therefore, outside of the compact's scope. Grandfather's argument, as we understand it, is that the ICPC is concerned only with placements that will entail ongoing agency funding and supervision, and that neither DHS nor California child-welfare officials will have responsibility for K once grandfather becomes her durable guardian.

The ICPC is an interstate compact intended to facilitate cooperation in the placement and monitoring of dependent children across state lines. *State ex rel Juv. Dept. v. Campbell*, 178 Or App 271, 275-76, 36 P3d 989 (2001). Oregon joined the compact in 1975. *See* Or Laws 1975, ch 482, § 1; OAR 413-040-0200. We construe the compact according to principles of contract law, with due consideration for Oregon's obligation not to impair its obligations under the agreement.[7] *See Tarrant Reg'l Water Dist. v. Herrmann*, 569 US 614, 133 S Ct 2120, 2130, 186 L Ed 2d 153 (2013) ("Interstate compacts are construed as contracts

---

[6] Grandfather acknowledges that the juvenile court is a "sending agency" for purposes of the ICPC. *See* ORS 417.200, Art II(b) ("sending agency" includes "a court of a party state").

[7] Because the legislature enacted the ICPC as statutory law, we also apply principles of statutory construction when appropriate. *See generally* Zimmermann & Wendell, *The Law and Use of Interstate Compacts* 1 (1976) ("An interstate compact is almost always a statute in each of the jurisdictions which is party to it and, even in those cases where this may not be strictly true, the instrument has the force of statutory law. As a result, the entire body of legal principles applicable to the interpretation of statutes is also applicable to the interpretation of compacts.").

under the principles of contract law."); *West Virginia ex rel. Dyer v. Sims*, 341 US 22, 28, 71 S Ct 557, 560, 95 L Ed 713 (1951) (reasoning that a state may not unilaterally nullify or impair its obligations under an interstate compact). Accordingly, we construe the terms of the ICPC with the goal of implementing the intent of the party states. *See James v. Clackamas County*, 353 Or 431, 441, 299 P3d 526 (2013) ("In interpreting a contract, we seek to implement the intent of the parties to the contract by considering the contract terms in their context."). In construing the ICPC, we are bound to "liberally construe[]" its terms to "effectuate the purposes thereof." ORS 417.200, Art X.

The ICPC does not define the term "foster care." Grandfather directs us to *Black's Law Dictionary*, which defines "foster care" in part to mean a "federally funded child-welfare program providing substitute care for abused and neglected children who have been removed by court order from their parents' or guardians' care." *Black's Law Dictionary* 771 (10th ed 2014). Based on that definition, grandfather reasons that "foster care" for purposes of the ICPC must be tied to public funding and that, when a durable guardianship does not involve ongoing state financial obligations, it is not subject to the ICPC's requirements. Put differently, because the juvenile court's order had the effect, in grandfather's view, of terminating DHS's obligations to K, the ICPC does not cover it.

We decline to adopt grandfather's proposed construction because it is inconsistent with the purposes of the ICPC and our concomitant obligation to construe the ICPC in a manner that effectuates those purposes. The express purposes of the ICPC are set forth in Article I, which provides, in part:

"It is the purpose and policy of the party states to cooperate with each other in the interstate placement of children to the end that:

"(a)   Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.

"(b)   The appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child.

"(c)   The proper authorities of the state from which the placement is made may obtain the most complete information on the basis on which to evaluate a projected placement before it is made."

ORS 417.200, Art I. Thus, as expressed in Article I, the compact is intended to promote cooperation between states in ensuring the safety and adequacy of care for "[e]ach child requiring placement." ORS 417.200, Art I(a). It would be inconsistent with those broad purposes to adopt the narrow definition of "foster care" urged by grandfather. *See State v. Gonzalez-Valenzuela*, 358 Or 451, 461, 365 P3d 116 (2015) ("[A] dictionary definition—although providing some evidence of meaning—should not be relied on to resolve a dispute about plain meaning without critically examining how the definition fits into the context of the statute itself.").

Although not conclusive, we find the "draftsman's notes" to the ICPC to be persuasive regarding the intended meaning of "foster care" as used in the ICPC. *See State of Oregon DCS v. Anderson*, 189 Or App 162, 178-80, 74 P3d 1149, *rev den*, 336 Or 92 (2003) (relying on commentary to a uniform act as legislative history); *see also McComb v. Wambaugh*, 934 F2d 474, 481 (3d Cir 1991) (relying on the draftsman's notes in construing the ICPC). Those notes indicate that the drafters chose the term "foster care" as a way to describe arrangements of such duration as to be "integral part[s] of the child rearing process," as opposed to arrangements that are presumptively temporary or for limited purposes:

"On the whole, the term 'foster care' has an established meaning in welfare circles sufficient to indicate a relation of some duration as an integral part of the child rearing process. A problem was encountered in connection with the multitude of personal and institutional arrangements which exist to serve temporary and specific functions. Since the Compact is conceived as an instrument for handling the general environmental problems of upbringing,

rather than specific and specialized mental, medical, and educational services, the definition of 'placement' specifically excludes such activities. * * *

"A problem of greater difficulty is posed by vacation camps and by the temporary deposit of a child with friends for recreational or similar social purposes. It was not believed practicable to attempt to draft language that would draw the line between such limited custodial arrangements and 'placement' in the true sense. The problems connected with writing legislation that would validly distinguish between a stay that was just long enough, and one that was not quite long enough, were of a type to suggest that specific phraseology in the definition would create more problems than it would solve. However, it is the clear intent to exclude such temporary arrangements for limited special purposes."

*Draftsman's Notes to the Interstate Compact on the Placement of Children, reprinted in* R. Hunt, *Obstacles to Interstate Adoption* 44-45 (1972). There is no indication in the commentary that the drafters understood the term "foster care" to be linked to whether a placed child would receive public funding.

Ultimately, we think that, if the party states had intended to exclude from the ICPC any state-ordered placement that does not involve public funding, they would have expressed that intention more clearly. That is so because such an exception is clearly in tension with the ICPC's broad purpose to ensure that each "child requiring placement" receive "the maximum opportunity" to be placed in a suitable environment and in the care of qualified persons. ORS 417.200, Art I(a). A child in a durable guardianship is one who "cannot safely return to a parent within a reasonable time," ORS 419B.366(5)(a), and therefore is a "child requiring placement"—in other words, a child within the class covered by the ICPC. *See* ORS 417.200, Art I(a); *cf. Dept. of Human Services v. J. G.*, 260 Or App 500, 517, 317 P3d 936 (2014) (rejecting argument that a durable guardianship under ORS 419B.366 is not a "foster care placement" under the Indian Child Welfare Act (ICWA) in part because such a conclusion would remove "an entire class of dependency placements" from the ICWA's protections in

the face of Congressional intent that the ICWA apply to all such placements). Given our obligation to liberally construe the compact to further its purposes, ORS 417.200, Art X, and in light of the compact's clear emphasis on cooperation among states in the placement of a ward across state lines, we are not persuaded that the party states intended to exempt a court-ordered durable guardianship from the ICPC's requirements.

We note that grandfather's interpretation, under the circumstances of this case, would clearly frustrate the objectives of the ICPC, thereby impairing the state's obligations under the agreement. *See Dyer*, 341 US at 28. The compact plainly contemplates that, where a child has become a public ward, the sending state will cooperate with the receiving state to find a "suitable environment" for the child and enable the "appropriate authorities" in the receiving state to "have full opportunity to ascertain the circumstances of the proposed placement." ORS 417.200, Art I(a), (b). Even if grandfather is correct that DHS will have no further responsibility for K, grandfather ignores the interest of the receiving state, California, regarding the placement of a ward within its borders—a child who, by definition, already has been determined to need the assistance of courts and public agencies in light of her family circumstances. If problems were to arise with grandfather's guardianship of K, it is foreseeable that it would fall to California authorities to intervene. We understand such concerns to be precisely what led to the adoption of the ICPC in the first place. If a juvenile court could avoid the ICPC's requirements simply by terminating DHS's role under these circumstances, the purpose of the compact would be defeated.

For the foregoing reasons, we agree with DHS and K that the juvenile court's permanency and guardianship judgments violate the ICPC because those judgments have the effect of "caus[ing]" K to be placed in California without the approval of California officials. *See* ORS 417.200, Art III(d) ("The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests

of the child."); *cf. Campbell,* 178 Or App at 278 (holding that the juvenile court's order appointing the child's grandfather as guardian violated the ICPC because it "caused" the child to be placed in Alaska without the approval of Alaska officials).

Permanency judgment and guardianship judgment reversed and remanded; otherwise affirmed.