Argued and submitted February 22, reversed and remanded April 21, 2021

In the Matter of J. B.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

D. C. B.
and N. L. B.,
*Appellants.*

Clackamas County Circuit Court
19JU05937; A174609 (Control)

In the Matter of J. B.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

D. C. B.
and N. L. B.,
*Appellants.*

Clackamas County Circuit Court
18JU04934; A174608

In the Matter of E. B.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

D. C. B.
and N. L. B.,
*Appellants.*

Clackamas County Circuit Court
18JU04939; A174612

In the Matter of E. B.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

## D. C. B.
## and N. L. B.,
*Appellants.*

Clackamas County Circuit Court
19JU05936; A174613

489 P3d 598

In this consolidated appeal of juvenile dependency cases, the juvenile court held that the Interstate Compact on the Placement of Children (ICPC), ORS 417.200 to 417.260, prohibited mother from residing in the state of Washington with her two children without that state's approval. On appeal, mother and father assign error to that ruling. *Held*: The Court of Appeals concluded that the ICPC applies only to children who are in substitutes for parental care, and, as such, its requirements are not mandatory when a child is placed with a parent in another state. Consequently, the trial court erred.

Reversed and remanded.

Colleen F. Gilmartin, Judge.

George W. Kelly argued the cause and filed the briefs for appellant D. C. B.

N. L. B. filed the brief *pro se*.

Erin K. Galli, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

TOOKEY, J.

Reversed and remanded.

**TOOKEY, J.**

In this consolidated appeal, mother and father appeal judgments of the juvenile court. The juvenile court held that the Interstate Compact on the Placement of Children (ICPC), ORS 417.200 to 417.260, prohibited mother from residing in the state of Washington with her two children, E and J, without that state's approval. We conclude that the ICPC applies only to children who are in substitutes for parental care, and as such, its requirements are not mandatory when a child is placed with a parent in another state. Consequently, we conclude that the trial court erred. We reverse and remand.

## I. FACTS AND PROCEDURAL HISTORY

The relevant facts are undisputed. In September 2018, based on admissions of mother and father, the juvenile court took jurisdiction and wardship over siblings, E and J. E, who had been taken to the hospital when E experienced seizures and vomiting, was diagnosed with injury consistent with being "shaken aggressively." E and J were placed in the legal custody and guardianship of DHS, and they were placed in substitute care.

In October 2018, E and J were returned to mother's physical custody pursuant to a safety plan, though they remained in the legal custody and guardianship of DHS. In January 2020, with the permission of DHS, mother, E, and J moved to Washington to live with mother's father and stepmother, who also act as safety service providers for the children. In an affidavit in the juvenile court, mother explained that she, E, and J, had moved in with mother's father and stepmother for "familial, financial, medical, and for ease of childcare" reasons: Mother is a "night shift nurse" and needs "overnight and daytime childcare," which stepmother is able to provide in a "reliable and stable" fashion; mother's father has "aggressive" cancer, and living together allows her father to "get to make the most of the time that he has left"; having the support of the children's grandparents makes "things like preschool, swim lessons, sports, etc. more doable for the children"; and mother and her father and stepmother are able to share finances.

Also, in January 2020, pursuant to the ICPC, DHS requested that authorities in Washington conduct a home study and approve E's and J's placement in Washington. In June 2020, the Washington Department of Children, Youth, and Families (WDCYF) denied DHS's request to place children in Washington under the ICPC. WDCYF informed DHS that "the children need to return" to Oregon because Washington was "denying placement," and that Washington would not "provide courtesy supervision" of children.

In July 2020, in the juvenile court, mother filed a "motion to continue placement and opposition to ICPC application." In mother's motion, she argued that the correct interpretation of the ICPC is that it "regulate[s] out of state placements in non-parental custody" and was inapplicable to her children given that the children were living with her. Also, in July 2020, father filed a motion in which he argued that the "ICPC does not apply to a placement with a parent who is living out of state."

DHS took a contrary view, arguing that the ICPC applies to "placement with a parent when a child is already within the court's jurisdiction." DHS explained that, because Washington was denying E's and J's placement, "Oregon has been instructed in following the ICPC to have the children returned to Oregon."

During a hearing on mother's and father's motions, a CASA for the children testified that, "if [mother, E, and J] have to move yet again," it would "do great harm" to the family. At the end of the hearing, the trial court ruled that the ICPC applies to placements with parents when DHS has legal custody and guardianship of the children and, thus, that the ICPC applied to E and J. As a result of the juvenile court's ruling, the children were required to return to Oregon, though the juvenile court stayed that order during the pendency of this appeal.

The judgments on appeal reflect that the trial court determined that the children had been "safely returned to mother's care," but that, with respect to J, mother had not made "sufficient progress toward meeting the expectations set forth in the service agreement." The judgments on appeal also reflect that the trial court determined that it was in the

best interest of the children to continue in the legal custody of DHS because there was "no explanation of [E's] injuries."

## II.   ARGUMENTS ON APPEAL

On appeal, mother and father contend that the ICPC does not apply when children are placed with a parent in another state. In particular, mother points to Article III of the ICPC, which limits application of the ICPC in the dependency context to "placement[s] in foster care or as a preliminary to a possible adoption," ORS 417.200, Article III, and contends that E and J residing with mother in Washington is not a "placement in foster care" or a "preliminary to a possible adoption." Father contends more generally that "[t]he ICPC by plain language and legislative intent unambiguously does not apply to natural parents."[1]

DHS, for its part, argues that the "[ICPC] would apply here, where mother has been deemed unfit and unable to care for the children without supervision." In DHS's view, the phrase "placement in foster care" in ORS 417.200, Article III, includes "a setting where the child is being cared for by someone who has been found unfit to have legal custody or guardianship of the child."

## III.   ANALYSIS

Whether the ICPC applies to the facts of the instant case is a question of law, which we review for legal error. *Dept. of Human Services v. A. B.*, 286 Or App 578, 580, 401 P3d 279 (2017). "We construe the compact according to principles of contract law, with due consideration for Oregon's obligation not to impair its obligations under the agreement." *Id.* at 584. "In interpreting a contract, we seek to implement the intent of the parties to the contract by considering the contract terms in their context." *James v. Clackamas County*, 353 Or 431, 441, 299 P3d 526 (2013). "Accordingly, we construe the terms of the ICPC with the goal of implementing the intent of the party states." *A. B.*, 286 Or App

---

[1] In his briefing, father also (1) raises arguments concerning "procedural and substantive due process rights under the 5th and 14th amendments" to the United States Constitution and (2) argues that "there is a severable exception in the ICPC, Art III, for the best interest of the children." In light of our analysis in this opinion, we need not reach those contentions.

at 585. Further, we are bound to "liberally construe[]" the terms of the ICPC to "effectuate the purposes thereof." ORS 417.200, Art X.

Moreover, "[b]ecause the legislature enacted the ICPC as statutory law, we also apply principles of statutory construction when appropriate." *A. B.*, 286 Or App at 584 n 7; *id.* (citing Zimmermann & Wendell, *The Law and Use of Interstate Compacts* 1 (1976) ("An interstate compact is almost always a statute in each of the jurisdictions which is party to it and, even in those cases where this may not be strictly true, the instrument has the force of statutory law. As a result, the entire body of legal principles applicable to the interpretation of statutes is also applicable to the interpretation of compacts.")). Under those principles, we "primarily consider the text and context of a statute because 'there is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes,' but we also consider legislative history 'where that legislative history appears useful to the court's analysis.'" *State v. Phillips*, 367 Or 594, 598, 482 P3d 52 (2021) (quoting *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009)).

At the outset, we note that the issue in this case—whether the provisions of the ICPC are mandatory when a child is placed with a parent in another state—is an issue that has divided courts across this country. For example, the United States Court of Appeals for the Third Circuit has held that the ICPC "applies *only to substitutes for parental care* such as foster care or arrangements preliminary to adoption," *McComb v. Wambaugh*, 934 F2d 474, 480 (3d Cir 1991) (emphasis added); "California cases have consistently held that the ICPC does *not* apply to an out-of-state placement with a parent," *In re C. B.*, 188 Cal App 4th 1024, 1026, 116 Cal Rptr 3d 294, 295 (2010) (emphasis in *C. B.*); and the Washington Court of Appeals has held "that ICPC does not require sister state approval of parental placements," *In re Dependency of D. F.-M.*, 157 Wash App 179, 193-94, 236 P3d 961 (2010), *rev den*, 170 Wash 2d 1026 (2011). That is in contrast to, for example, the conclusions reached by the Supreme Court of Mississippi, *K. D. G. L. B. P. v. Hinds Cty. Dep't of Human Servs*, 771 So 2d 907, 913 (Miss 2000)

(holding that "pursuant to the Interstate Compact on the Placement of Children, the Department of Human Services is prohibited from placing the children back in the mother's home [in Florida] without the approval of [Florida]" (internal citation omitted)), and the Massachusetts Court of Appeals, *Adoption of Warren*, 44 Mass App Ct 620, 624, 693 NE2d 1021, 1025, *rev den*, 427 Mass 1107 (1998) ("The placement of Warren with his father in New York by [the Department of Social Services] would constitute a placement under the Interstate Compact, thereby rendering the provisions of the Interstate Compact applicable to the present case.").

Courts in some other states, such as New York, have not reached a uniform interpretation throughout the state. *See Matter of Emmanuel B. (Lynette J.)*, 175 AD3d 49, 57-58, 106 NYS3d 58, 65, *leave to appeal dismissed*, 34 NY3d 1036 (2019) ("While this Court [in the First Department] is mindful that the Second Department has held that the ICPC applies to a nonrespondent parent living outside of New York, we decline to follow its interpretation, because in our opinion it conflicts with the plain meaning of the statute and is in contravention of its legislative history."); *see also C.B.*, 188 Cal App 4th at 1027 n 1, 116 Cal Rptr 3d at 296 n 1 (with regard to whether the ICPC applies when children are placed with a parent out of state, noting "Florida can't seem to make up its mind").[2]

As we have done previously when construing the ICPC, we "begin our analysis with an overview of the [ICPC]." *State ex rel Juv. Dept. v. Campbell*, 178 Or App 271, 275, 36 P3d 989 (2001).

"The [ICPC] was drafted in the 1950s in response to problems encountered by state social service agencies when placing children across state lines." *Id.* "At that time, states

---

[2]  The lack of uniformity is problematic: "'One of the key elements of any interstate compact is uniformity in interpretation.'" *C.B.*, 188 Cal App 4th at 1026, 116 Cal Rptr 3d at 295 (quoting Kimberly M. Butler, *Child Welfare—Outside the Interstate Compact on the Placement of Children—Placement of a Child with a Natural Parent*, 37 Villanova L Rev 896, 916 (1992)). In *C.B.*, the California Court of Appeal posited that the "lack of uniformity [in interpretation of the ICPC] is dysfunctional, that courts and rule makers have not been able to fix it, and hence that it may call for a multistate legislative response." 188 Cal App 4th at 1027, 116 Cal Rptr 3d at 296.

lacked the authority to order services for children who were once in their jurisdiction but were subsequently transferred to a new home in another state." *Id.* "Moreover, agencies found it difficult to coordinate the provision of services with states to which such children were sent." *Id.*

In 1960, the Council of State Governments proposed adoption of an interstate compact. *See* Council of State Governments, *Suggested State Legislative Program for 1961* 49 (1960). In outlining the compact, the Council explained, "The compact provides procedures for the interstate placement of children (either by public agencies or by private persons or agencies) when such placement is for foster care or as a preliminary to a possible adoption." *Id.* Oregon joined the compact in 1975. *See* Or Laws 1975, ch 482, § 1. The ICPC has now been enacted by all 50 states, by the District of Columbia, and by the U.S. Virgin Islands. *Campbell*, 178 Or App at 275-76.

Article I describes the ICPC's purpose and policy:

"It is the purpose and policy of the party states to cooperate with each other in the interstate placement of children to the end that:

"(a)   Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.

"(b)   The appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child.

"(c)   The proper authorities of the state from which the placement is made may obtain the most complete information on the basis on which to evaluate a projected placement before it is made.

"(d)   Appropriate jurisdictional arrangements for the care of children will be promoted."

ORS 417.200, Art I.

To accomplish that goal,

"The Compact provides for notification of appropriate state or local authorities in the receiving state before placement by out-of-state persons and agencies. The authorities in the receiving state are given the opportunity to investigate and, if satisfied, must notify the sending state that the proposed placement does not appear to be contrary to the child's interest."

*See McComb*, 934 F2d at 480. Importantly, when the ICPC applies, a child "is not to be placed in the receiving state until 'the appropriate public authorities [in the receiving state] *** notify the sending agency [in the sending state] *** that the proposed placement does not appear to be contrary to the interests of the child.'" *Campbell*, 178 Or App at 276-77 (quoting ORS 417.200, Art III(d); omissions in *Campbell*).

Article III is the "heart of the compact" and "contains the guidelines that govern when *** it applies." *Id.* at 276. In particular, subsection (a) of Article III specifies "when a child placement is subject to the compact's requirements." *Id.* That subsection provides:

"(a) No sending agency shall send, bring, or cause to be sent or brought into any other party state any child *for placement in foster care* or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article."

ORS 417.200, Art III (emphasis added).

The ICPC does not define "foster care." "Placement," however, is defined in the ICPC as "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution but does not include any institution caring for the mentally ill, mentally defective or epileptic or any institution primarily educational in character, and any hospital or other medical facility."[3] ORS 417.200, Art II(d).

_____

[3] Article II(b) "defines sending agency to include any 'court of a party state.'" *Campbell*, 178 Or App at 277 (quoting ORS 417.200, Art II(b)).

Additionally, Article VIII(a) of the ICPC provides that the ICPC does not apply to:

As noted, DHS contends that Article III(a) of the ICPC is applicable to E's and J's current residency in Washington, because E and J residing with mother in Washington constitutes a "placement in foster care" under Article III(a) of the ICPC.[4]

We previously construed the meaning of "foster care" in Article III of the ICPC in *A. B.* In that case, we considered the meaning of "foster care" in Article III when assessing whether the juvenile court erred in appointing a child's grandfather—who lived in California—as the child's guardian in a durable guardianship, "notwithstanding California's refusal to accept that placement under the ICPC." 286 Or App at 583. The grandfather argued that the ICPC did not apply to the placement, because "foster care," as that term is used in the ICPC, "must be tied to public funding and that, when a durable guardianship does not involve ongoing state financial obligations, it is not subject to the ICPC's requirements." *Id.* at 585. We rejected the grandfather's argument, noting that it would be "inconsistent" with the "broad purposes" of the ICPC to "adopt the narrow definition of 'foster care' urged by grandfather." *Id.* at 586.

---

"The sending or bringing of a child into a receiving state by a parent, stepparent, grandparent, adult brother or sister, adult uncle or aunt, or guardian and leaving the child with any such relative or nonagency guardian in the receiving state."

ORS 417.200, Art VIII(a).

On appeal, mother argues that Article VIII(a) makes the ICPC inapplicable to this case. We disagree.

We have interpreted Article VIII(a) to mean that the ICPC "does not apply to private arrangements for a child's placement when those arrangements are made between a limited class of persons consisting primarily of close relatives and not brought about by a 'sending agency.'" *Campbell*, 178 Or App at 277. In this case, because mother's children remained wards of the court, mother could not move them out of state without at least the "tacit approval" of the juvenile court, and therefore mother's move to Washington was "brought about" by a "sending agency" within the meaning of the ICPC, and was not exempt from the ICPC by operation of Article VIII. *See id.* at 279 ("So long as the child remained a ward of the court, neither [grandparent] nor the child's parents could have achieved the out-of-state placement without the juvenile court's active assistance and tacit approval of [grandparent's] proposal for placement [with grandparent in Alaska]. The juvenile court's order [appointing grandparent as durable guardian] thus 'caused' the child's placement in Alaska.").

[4] DHS does not contend that E's and J's residing with mother in Washington constitutes a "preliminary to a possible adoption."

In *A. B.*, in assessing the meaning of "foster care," as that phrase is used in Article III(a), we looked to the "draftsman's notes," which we found to be persuasive. *Id.* Those notes reflect that the term "foster care" was chosen because,

> "[o]n the whole, the term 'foster care' has an established meaning in welfare circles sufficient to indicate a relation of some duration as an integral part of the child rearing process. A problem was encountered in connection with the multitude of personal and institutional arrangements which exist to serve temporary and specific functions. Since the Compact is conceived as an instrument for handling the general environmental problems of upbringing, rather than specific and specialized mental, medical, and educational services, the definition of 'placement' specifically excludes such activities. * * *

> "A problem of greater difficulty is posed by vacation camps and by the temporary deposit of a child with friends for recreational or similar social purposes. It was not believed practicable to attempt to draft language that would draw the line between such limited custodial arrangements and 'placement' in the true sense. The problems connected with writing legislation that would validly distinguish between a stay that was just long enough, and one that was not quite long enough, were of a type to suggest that specific phraseology in the definition would create more problems than it would solve. However, it is the clear intent to exclude such temporary arrangements for limited special purposes."

*Draftsman's Notes to the Interstate Compact on the Placement of Children, reprinted* in R. Hunt, *Obstacles to Interstate Adoption* 44-45 (1972). Thus, in *A. B.*, we explained that "foster care," as used in the ICPC, meant "arrangements of such duration as to be 'integral part[s] of the child rearing process,' as opposed to arrangements that are presumptively temporary or for limited purposes." 286 Or App at 586 (brackets in *A. B.*). We concluded that, because a child "in a durable guardianship is one who 'cannot safely return to a parent within a reasonable time,' ORS 419B.366(5)(a)," such a child is "a 'child requiring placement'—in other words, a child within the class covered by the ICPC." *Id.* at 587. We also noted that, "[g]iven our obligation to liberally construe

the compact to further its purposes, ORS 417.200, Art X, and in light of the compact's clear emphasis on cooperation among states in the placement of a ward across state lines, we are not persuaded that the party states intended to exempt a court-ordered durable guardianship from the ICPC's requirements." *Id.* at 588.

In this case, we face a different question than we did in *A. B.*: Does the phrase "placement in foster care," as it is used in Article III of the ICPC, mean only a placement that is a substitute for parental care—including, for example, the durable guardianship at issue in *A. B.*—or does the phrase "placement in foster care" include arrangements under which a child is living with a parent? As explained below, we conclude that the phrase "placement in foster care" means living arrangements that are substitutes for parental care, and that the ICPC's requirements are accordingly not mandatory with regard to E's and J's residency in Washington with their mother.

As an initial matter, we observe that the "plain, ordinary meaning of the term [foster care] is the placement of children in a substitute placement, one other than that of the child's parents." *D. F.-M.*, 157 Wash App at 188-89, 236 P3d at 965; *see also* Vivek S. Sankaran, *Out of State and Out of Luck: The Treatment of Non-Custodial Parents Under the Interstate Compact on the Placement of Children*, 25 Yale L & Pol'y Rev 63, 70-71 (2006) (reviewing various provisions of the ICPC, including Article III(a), and noting that the "plain language of these provisions evinces the intent of the drafters to respect the integrity of the family and to allow parents to plan for the care of their own children unless the children were being placed in foster care or were being adopted").

Indeed, at the time Oregon enacted the ICPC, "foster care" was commonly understood to mean "supervised care for orphaned, neglected, or delinquent children or for persons mentally ill *in a substitute home* or an institution on either a full-time or day-care basis." *Webster's Third New Int'l Dictionary* 897 (unabridged ed 1966) (emphasis added). Similarly, a contemporaneous edition of *Black's Law Dictionary*, although lacking a definition of "foster care,"

defined "foster parent" as "[o]ne who has performed the duties of a parent *to the child of another* by rearing the child as his own child." *Black's Law Dictionary* 784 (rev 4th ed 1968) (emphasis added). That definition is also present in the 1951 edition of *Black's*, which was the edition in publication at the time the ICPC was drafted. *Black's Law Dictionary* 784 (4th ed 1951) (defining "foster parent" in the same way). In contrast, *Black's* defined a "parent" as

> "[t]he lawful father or the mother of a person. One who procreates, begets, or brings forth offspring. * * *
>
> "* * * The word 'parents' should therefore not ordinarily be construed to include grandparents."

*Black's Law Dictionary* 1269 (rev 4th ed 1968). Thus, it appears to us that the "established meaning" of a "placement in foster care"—both at the time the compact was drafted and at the time Oregon entered the compact—was a placement that operated as a substitute for parental care, and, as noted in *A. B.*, was one of such duration as to be an integral part of the child rearing process. 286 Or App at 586.

That understanding of the phrase "placement in foster care" is supported by the definition of the term "placement" in the ICPC. As noted, the ICPC defines "placement" to mean, in relevant part, "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution." ORS 417.200, Art II(d).

That definition of "placement" in the ICPC is, itself, "somewhat ambiguous," insofar as "[f]amily free" is "not a term of art, and its meaning is by no means clear on its face." *C. B.*, 188 Cal App 4th at 1032, 116 Cal Rptr 3d at 299. One commentator has observed, however, that "it means a family home in which a child lives without charge and is provided 'the care which children usually receive from their parents as part of the process of upbringing.'" Bernadette W. Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption*, 68 Neb L Rev 292, 298 (1989) (quoting American Public Welfare Association, *The Interstate Compact on the Placement of Children: Compact Administrators' Manual* 2.2 (Compact

Provisions, An Interpretative Commentary) (1982)); *see also In re Alexis O.*, 157 NH 781, 787, 959 A2d 176, 182 (2008) (noting "although the term 'family free' home is not defined, in context it refers to a home that provides care for a child similar to that which a family would provide, but that, unlike a boarding home, charges no fee for this care"). That is, a "family free" home refers to "nonparental residential arrangements that provide children with the kind of care usually received from parents." *D.F.-M.*, 157 Wash App at 189, 236 P3d at 965.

With that understanding of the term "family free," it appears that the various types of "placements" contemplated by the ICPC—*i.e.*, a "family free or boarding home," and a "child-caring agency or institution"—are all nonparental residential arrangements. That is, they are arrangements that are substitutes for parental care.

Statutes in effect when Oregon entered the ICPC in 1975 further indicate that, when Oregon entered the ICPC, the phrase "placement in foster care" would have likely been understood to be mean arrangements for children that were substitutes for parental care.

For example, ORS 418.625 (1975), which concerned "foster homes not supervised by child-caring agencies," defined "foster home," in relevant part, as "any home maintained by a person who has under his care in such home any child under the age of 18 years not related to him by blood or marriage *and unattended by its parent or guardian*, for the purpose of providing such child with care, food and lodging purposes." (Emphasis added.) And ORS 420.810 (1975), titled "placement of students of juvenile training school in foster homes," contemplated the placement of certain children who were in "the legal custody of the Children's Services Division" with "any person or family of good standing and character" pursuant to a placement agreement, while another statute, ORS 420.835 (1975), specifically prohibited a "parent or other person not party to the placement agreement" from "interfer[ing] or assum[ing] any control over the placed child." Those statutes reflect that the term "foster care" was likely understood to include arrangements that functioned as substitutes for parental care, but not parental care itself.

We note that understanding the phrase "placement in foster care" to refer to substitutes for parental care is consistent with the legislative history of ORS 417.200. Oregon joined the compact in 1975 with enactment of Senate Bill (SB) 161 (1975). Or Laws 1975, ch 482, § 1. Senator Mary Roberts, a sponsor of the bill, explained that the compact's purpose was to "provide the protection of state law to children placed across state lines into foster care, adoption, or in institutions for children," and that the "great majority of interstate placements are in the areas of foster care and adoption." Exhibit A, Senate Committee on Judiciary, SB 161, Feb 19, 1975 (accompanying statement of Sen Mary Roberts); *see also* Appendix C, House Committee on Judiciary, SB 161, May 22, 1975 (same). The legislative history of SB 161 does not reflect that the legislature understood the phrase "placements in foster care" to include circumstances where a child is placed in a parent's physical custody. Indeed, DHS observes in its brief, "[t]here is no indication that the legislature, in passing SB 161, considered whether the compact would apply to an interstate placement when the child is in the parent's physical custody while also in the legal custody of the state."

In urging us to conclude that "the term 'foster care' includes placement with an out-of-state parent when the child was removed from that parent's legal custody and is a ward of the court," and that the ICPC thus applies in this case, DHS, citing ORS 417.200, Article X, observes that we have an obligation to "liberally construe[]" the term "foster care" to effectuate the purposes of the ICPC. DHS notes that one purpose of the ICPC is "cooperation among states so that '[t]he appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements *for the protection of the child*.'" (Quoting ORS 417.200, Art I(b); emphasis in DHS's brief.) But the goal of cooperation among member states must be viewed in conjunction with the other goals of the ICPC— including ensuring that "[e]ach child requiring placement shall receive the maximum opportunity to be placed in a suitable environment."

It is far from clear to us that interpreting the provisions of the ICPC to be mandatory when a child is placed with a parent across state lines would further that goal. *See, e.g.*, *In re Emmanuel B.*, 175 AD3d at 58, 106 NYS3d at 65 (noting New York policy of keeping "biological families together" and noting "[i]t is somewhat ironic that a statute with a stated purpose of providing more opportunities for children in need of placement would be construed to effectively prohibit the placement of a child with a natural parent"); *State, Div. of Youth & Family Servs. v. K. F.*, 353 NJ Super 623, 635, 803 A2d 721, 729 (App Div 2002) ("It would be nonsensical to use the ICPC, as DYFS suggests, to prohibit a court's placement of children with their natural family solely because that family resides in another state.").[5]

## IV.   CONCLUSION

In sum, we conclude that "placement in foster care," as that phrase is used in ORS 417.200, Article III, refers to substitutes for parental care and does not encompass circumstances such as those in the instant case, where children are residing with a parent in another state. Accordingly, we conclude that the juvenile court erred, and we reverse and remand.[6]

---

[5] In pressing its arguments on appeal, DHS also points to the definition of "foster child" from the sixth edition of *Black's*—*i.e.*, a "Child whose care, comfort, education and upbringing has been left to persons other than his natural parents"—and the definition of "foster home" from the sixth edition of *Black's*—*i.e.*, "[a] home for children without parents or who have been taken from their parents." *Black's Law Dictionary* 656 (6th ed 1990).

DHS contends that those "definitions suggest that a foster care situation can arise whenever someone other than a child's parents are responsible for the child's care." DHS posits that "that is the situation here," because DHS, as the "guardian and custodian," is "responsible for the children's care" insofar as DHS is "responsible for the control of the ward, for supplying the ward with food, clothing, and shelter, for providing care and education, for authorizing medical care, and for making substantial legal decisions concerning the ward."

Mother responds that DHS has a "unique view" of what constitutes "foster care." In mother's view, although DHS has "'custody,' which is a decision-making power," it is mother who "lives with the children 24/7," and "is the person who provides their 'care, comfort, education and upbringing.'"

We are unpersuaded by DHS's argument. E and J, who live with their mother and receive "care, comfort, [and] education" from their mother, are not "foster children" as we understand that term in light of the authorities discussed above.

[6] We note that our decision in this case is contrary to *dictum* in *State ex rel Juv. Dept. v. Smith*, 107 Or App 129, 811 P2d 145, *rev den*, 312 Or 235 (1991). In that case, in a footnote, we stated as follows:

Reversed and remanded.

---

"[H]ad the court carried out its threat to terminate [Children Service's Division's] custody of the child in this case, it still would have had to comply with the Interstate Compact by waiting for notification from Washington that the proposed placement [with the mother] was not contrary to the child's welfare. ORS 417.200, Art III(d)."

*Id.* at 132 n 4.

We note that "when *** the court mentions an interpretation of a statute by way of *dictum*, that interpretation is not binding." *Sundermier v. PERS*, 269 Or App 586, 594, 344 P3d 1142, *rev den*, 357 Or 415 (2015) (emphasis in original). *See also Engweiler v. Persson/Dept. of Corrections*, 354 Or 549, 557, 316 P3d 264 (2013) (noting that "[t]his court may consider itself bound to follow a prior statutory construction as a matter of *stare decisis*" but, "[w]hen the court's prior construction is mere *dictum*, *** it has no such precedential effect"); *Riverview Condo. Assn v. Cypress Ventures*, 266 Or App 574, 599, 339 P3d 447 (2014) ("[W]e do not understand the footnote [in a different case] to have any precedential value" because "[m]ost important, it is unquestionably *dictum*."). Therefore, we do not consider ourselves bound by our *dictum* in *Smith*, which, upon closer consideration, we view as having misstated the law.